*Rule absolute.*

WYATT ET AL., APPELLANTS, v. THE LARIMER AND WELD IRRIGATION COMPANY ET AL., APPELLEES.

1. JURISDICTION OF THE SUPREME COURT.

The jurisdiction of the supreme court may be invoked upon an appeal from the judgment of the court of appeals in an action that relates to a freehold.

2. FREEHOLD DEFINED.

A freehold is any estate of inheritance or for life in either a corporeal or incorporeal hereditament existing in or arising from real property of free tenure.

3. WATER RIGHTS—FREEHOLD.

A perpetual right to have a certain quantity of water flow through an irrigating ditch is an easement in the ditch, an incorporeal hereditament descendible by inheritance, and a freehold estate.

4. WATER RIGHTS—STATUS OF CANAL COMPANIES.

An irrigating canal company is not the proprietor of the water diverted by it. It must be regarded as an intermediate agency existing for the purpose of aiding consumers in the exercise of their constitutional rights, as well as a private enterprise prosecuted for the benefit of its owners.

5. CONSTRUCTION OF CONTRACTS.

The true intent and meaning of the contracts entered into between the irrigation company and the plaintiffs must be determined by the terms used read in the light of the circumstances surrounding the parties at the time of their execution, the subject-matter thereof, and the purposes and objects to be accomplished thereby.

6. WATER CONTRACTS, WHEN ILLEGAL.

Contracts by a ditch company to dispose of water rights in excess of its ability to furnish water are not only inequitable and unfair, but illegal.

7. CONSTRUCTION OF CONTRACTS.

If the terms of a contract admit of two meanings, one of which would render the contract unlawful and the other lawful, the latter must be adopted.

8. SAME.

Where doubt exists as to the construction of an instrument prepared by one party, upon the faith of which the other party has incurred obligations or parted with his property, that construction should be adopted which will be favorable to the latter party; and where an instrument is susceptible of two constructions—the one working injustice and the other consistent with the right of the case—that one should be favored which upholds the right.

9. SAME.

In cases where the language used by the parties to the contract is indefinite or ambiguous, and hence, of doubtful construction, the practical interpretation by the parties themselves is entitled to great, if not controlling, influence.

10. PLEADING—EQUITY.

A complaint, by the allegations of which it is made to appear that the plaintiffs have certain well defined rights that will be materially impaired if the defendants do the acts threatened, states a cause of action cognizable by a court of equity.

*Appeal from the Court of Appeals; original appeal being from the District Court of Weld County.*

THE appellants suing for themselves and also on behalf of all other users of water, except the defendants, who obtain their supply from the canal of defendant, The Larimer and Weld Irrigation Company, by virtue of the water right contracts issued by said company, brought this action in the district court of Weld county to enjoin the company from selling additional water rights or entering into further water right contracts providing for the prorating of the water flowing in its canal.   The complaint is in substance as follows :

That The Larimer and Weld Irrigation Company was duly incorporated pursuant to the laws of this state as a ditch company and a carrier of water for irrigation in the month of March, 1879.

That it acquired an old ditch known as " Canal No. 10 " in Larimer county, and enlarged and extended the same during 1878 and 1880 and subsequent years, and that as so en-

larged it is now known as The Larimer and Weld Irrigation Canal.

That it has, for many years past, by means of such canal, diverted water from the Cache la Poudre river at its headgate in Larimer county, and distributed the water so accumulated among the consumers' and appropriators who own land along the line of the canal, capable of irrigation therefrom, and who have entered into written contracts with the company concerning such water delivery.

" That all written contracts or agreements for water rights made by the defendant, The Larimer and Weld Irrigation Company, with water consumers and appropriators under the line of said canal have mentioned, as a unit of comparison and measurement, what is known as an 80-acre water right, which is defined in all such contracts as one and forty-four one-hundredths cubic feet of water per second flowing over a weir at one of the lateral headgates, along the line of said defendant's canal, said amount of water to be used during the irrigating seasons or so long as needed during such seasons for the proper irrigation of eighty acres of land."

That in 1879, upon the acquisition of canal No. 10, the company entered into contracts with the persons who had acquired vested appropriations by virtue of user of water therefrom, expressly recognizing and confirming their rights to the continued use of water from defendants' canal, in the aggregate, of twenty-nine and three fourths 80-acre water rights, and allowing the owners of such rights to divert the full *quota* of water appertaining thereto, and without *prorating* with other owners of water rights in the canal in times of scarcity.

That such contracts for the preferred twenty-nine and three fourths water rights are still outstanding.

That the defendant, in addition to such contracts, did, for valuable considerations, from 1880 to 1888, enter into written contracts with other users of water in possession of land lying under said canal, all of which are in full force and outstanding, and amounting in the aggregate to two hundred

and ninety-two and three fourths 80-acre water rights, whereby it agreed perpetually, during the irrigating seasons, to deliver water to said parties.

That said water rights are owned and controlled as follows:

Fifty-six by the defendant B. H. Eaton; twenty-four by David C. Wyatt, Demosthenes B. Wyatt and Lewis L. Wyatt; two by Herbert J. Thompson; and the remaining two hundred and ten and three fourths are owned by other consumers who have a common and general interest with plaintiffs in the distribution of water in defendant's canal, and in whose behalf the action is also brought.

That they and plaintiffs, during each and every irrigating season since their rights were acquired, have engaged in cultivating and raising crops, and used and appropriated all the water appropriated to them in pursuance of such contract; have promptly paid all assessments levied by defendant company and have in all respects complied with the terms of their contract.

"That each of the several written contracts entered into by and between the defendant, The Larimer and Weld Irrigation Company, of the one part, and the respective water right owners of the other part, has been written upon a certain regular printed blank form of contract, and each of said contracts contains the following printed conditions, to wit:

" 6th. The said company agrees that when it shall have sold and have outstanding and in force a number of water rights equal to the estimated capacity of the company's canal to furnish water, it will then issue and deliver to the holder of each water right who shall have complied with the terms and conditions of this contract, without further consideration, four shares of the stock of said company for every water right hereby sold, which the purchaser hereof agrees to accept.

" 7th. It is hereby distinctly understood and agreed by and between the parties hereto, that in case the canal of said company shall be unable to carry and distribute a volume of

water equal to its estimated capacity, either from casual or unforeseen or unavoidable accident, or if the volume of water prove insufficient from drouth, or from any other cause beyond the control of said company, the company shall not be liable in any way for the shortness or deficiency of supply occasioned by any of said causes.

" 8th. It is further agreed that if by reason of any causes the supply of water shall be insufficient to fill and flow through said canal, according to its estimated capacity, or if from any other cause, as aforesaid, beyond the control. of said company, the supply shall be insufficient to furnish an amount equal to all the water rights then outstanding, the said company shall have the right to distribute such water as may flow through said canal to the holders of such water rights *pro rata;* and, for the purpose of so doing, may establish and enforce such rules and regulations as it may deem necessary or expedient."

That in addition to the water right contracts mentioned, the defendant company did allow B. H. Eaton, prior to 1889, to use forty additional 80-acre water rights on his land, for which no written contract was entered into by them, and for which no consideration was paid; but were so used that vested appropriations would accrue in connection therewith, and that such water rights should ultimately be applied to the irrigation of certain lands belonging to defendant, The Colorado Mortgage and Investment Company of London, (Limited;) and that prior to 1889 defendant allowed certain tenants of The Colorado Mortgage and Investment Company of London (Limited), to use for irrigation purposes four additional water rights upon its land.

That all the water diverted from the Cache la Poudre river. by means of defendant's canal at any time, has been used for the irrigation of land lying under said canal, by the owners and users of the water rights before mentioned, and only by them.

That prior to 1889 all the water flowing in the Cache la Poudre river during the irrigation season was actually di-

verted and appropriated to beneficial purposes by means of several ditches supplied therefrom, except during the spring floods.

That by reason of prior appropriations from said river, the defendant irrigation company has been unable to deliver to the respective water right owners under its canal water to the extent of one and forty-four one hundredths cubic feet per second to each water right, though actually needed for irrigation by all of the respective owners and users, and has *pro rated* all the water which it was allowed to divert among its water right owners pursuant to the stipulation and conditions contained in its water right contracts; and that such owners have acquiesced in such *pro rata* distribution to the extent of said three hundred and sixty-six and one half water rights.

That there is not sufficient water, not otherwise appropriated, to enable defendant irrigation company to dispose of any more water rights from and under its canal.

That it has already disposed of water rights equal to and in excess of its ability to furnish water.

That the irrigation company, for two years past, has refused to execute additional contracts, though often requested to do so by divers persons; and, except for the wrongful conspiracy hereinafter set forth, has persistently and consistently, through its authorized agents, admitted that it could not dispose of any more water rights without violating its duty to the present water right owners.

That The Colorado Mortgage and Investment Company of London (Limited) owns six thousand three hundred and forty-one acres of arid land under the canal that has never been irrigated.

That the managers of this company and the defendant Eaton constitute the board of directors of the irrigation company.

That Eaton is largely indebted to said investment company and the irrigation company.

That he, Eaton, has proposed to the defendant companies

that if they will sell to him a large number of 80-acre water rights, not less than fifty or more than one hundred and twenty-eight in addition to his outstanding written contracts for the fifty-six water rights now in his name, and also forty water rights which he has been using; which new water right contract shall contain the same terms and conditions as to *pro rating* and the right to stock as are provided for in the contracts of plaintiffs and others similarly situated,—that he will buy the six thousand three hundred and forty-one acres of land from The Colorado Mortgage and Investment Company of London, (Limited;) and that by means of said property he will be enabled to borrow large sums of money and be thereby able to pay his indebtedness to said companies.

That the said defendants have conspired and confederated together for the purpose of carrying out the plans aforesaid, and do now threaten, and unless restrained by injunction will cause to be issued by defendant irrigation company, to defendant Eaton, a large number of water right contracts in excess of the three hundred and sixty-six and one half which have heretofore been used and appropriated; and will, unless so restrained, *pro rate* the water among additional water rights to those now outstanding, and deprive plaintiffs and other water right owners of a very material portion of the water rights they have for years beneficially used and are entitled to receive, and permanently diminish the value of said water rights and cause said plaintiffs irreparable injury.

Prays that defendants be enjoined from carrying out this conspiracy and from issuing any water rights in excess of the three hundred and sixty-six and one half now outstanding, and from *pro rating* any of the water flowing in its canal at any time when there is not sufficient water to furnish one and forty-four one hundredths cubic feet per second for each 80-acre water right, among any other or additional water rights in excess of the three hundred and sixty-six and one half.

To this complaint defendants filed general and special demurrers; the special grounds of demurrer were overruled,

general demurrer sustained and action dismissed by the district court.

From this judgment plaintiffs appealed to the court of appeals, wherein the judgment of the district court was affirmed. Plaintiffs bring the case into this court on appeal from that judgment, predicating their right to such appeal upon the ground that the action relates to a freehold and franchise, and that the construction of constitutional provisions is necessary to the determination of the case.

Appellees deny their right to an appeal, and insist that the action does not fall within the enumerated category of actions in which an appeal is allowed from the court of appeals to the supreme court, and move to dismiss the appeal for want of jurisdiction.

The following statutory provisions, in the act establishing the court of appeals, p. 118, Laws of 1891, confer and regulate the right to appeal from judgments of the court of appeals to this court.

Sec. 1. "No writ of error from, or appeal to, the supreme court shall lie to review the final judgment of any inferior court, unless the judgment, or in replevin, the value found exceeds two thousand five hundred dollars, exclusive of costs. Provided, This limitation shall not apply where the matter in controversy relates to a franchise or freehold, nor where the construction of a provision of the constitution of the State or of the United States is necessary to the determination of a case."

"Sec. 4. * * * Third: It shall have jurisdiction, not final, in cases where the controversy involves a franchise or freehold, or where the construction of a provision of the constitution of the State, or of the United States, is necessary to the decision of the case, * * *."

"Sec. 15. Writs of error from, or appeals to, the supreme court, shall lie to review every final judgment of the court of appeals in cases which, under this act, might have been taken for review to the supreme court in the first instance."

VOL. XVIII—20

The right of appeal to this court from the district courts is provided by sec. 388, p. 206, Code 1887.

"Sec. 388. Appeals to the supreme court from the district court * * * shall be allowed in all cases where the judgment or decree appealed from be final; and shall amount, exclusive of costs, to the sum of one hundred dollars, or relate to a franchise or freehold."

Mr. H. N. HAYNES and Messrs. TELLER & ORAHOOD, for appellants.

Mr. J. W. McCREERY and Mr. HUGH BUTLER, for appellees.

MR. JUSTICE GODDARD delivered the opinion of the court.

The right to the relief demanded in this action is predicated upon, and must be determined by, the terms of the contracts entered into by the respective parties; and while those contractual rights are analogous to the rights guaranteed by the constitution to appropriators of water, the action involves only the construction of private contracts between the ditch company and the plaintiffs, and no constitutional question is involved in the decision of the case. The jurisdiction of this court by appeal, therefore, depends solely upon the question whether the action relates to a freehold.

It is strenuously insisted by counsel for appellees that an action must *involve* a freehold to enable this court to entertain jurisdiction, basing this claim upon the third subdivision of section four of the act establishing the court of appeals, above cited. When construed with other sections of the act, we think the word "involve," as used in that section, must be held to be synonymous with the word "relate," and the jurisdiction of this court may be invoked upon an appeal from a judgment of the district court or of the court of appeals in actions that *relate* to a freehold. It is therefore necessary to ascertain and define the nature and kind of prop-

erty claimed by plaintiffs in the water rights in question, and whether the nature and extent of their interests therein constitute freehold estates, and whether this action relates thereto. A freehold is defined as "Any estate of inheritance or for life in either a corporeal or incorporeal hereditament existing in or arising from real property of free tenure." 2 Black. Com. 104.

An incorporeal hereditament is "Anything, the subject of property which is inheritable, and not tangible or visible." 2 Wood. Lect. 4.

"A right issuing out of a thing corporate (whether real or personal), or concerning or annexed to or exercisable within the same." 2 Black. Com. 20; 3 Wash. R. P. 401.

"The right of a party to have the water of a stream or water course flow to or from his lands or mill, over the land of another, is an incorporeal hereditament, and an easement, or a prædial service, as defined by the civil law." Cary v. Daniels, 5 Metc. 238.

The plaintiffs allege a right to have a certain quantity of water flow through the irrigation company's ditch. This right is an easement in the ditch. It is a right annexed to realty, and, being a perpetual right, is an incorporeal hereditament descendible by inheritance to plaintiff's heirs, and, hence, a freehold estate.

The subject-matter of the action is this estate. The acts threatened by defendants will, if carried out, materially diminish this estate and permanently depreciate the value of the water rights.

The object of the action being to enjoin or prevent such diminution, or, in other words, to preserve the estate of the plaintiffs, the necessary result of the decree will be,—one party will gain and the other lose a material portion of such estate. The action, therefore, relates to a freehold, and this court, under the statutory provisions above cited, has jurisdiction to review the judgment of the court of appeals.

The decision by the court of appeals in this case was rendered by a divided court. We are unable to see wherein the

discussion by the learned judge writing the majority opinion touching the constitutional *status* of irrigation companies in this state was essential to the decision of the questions involved in the case.    But, inasmuch as the views expressed in that opinion are so at variance with numerous decisions of this court, we feel impelled to express our disapproval thereof, and our adherence to the doctrine heretofore announced by this court in relation to the *status* of canal companies organized for the purpose of carrying water for general purposes of irrigation.    We adhere to the doctrine that such a canal company is not the proprietor of the water diverted by it, but that " it must be regarded as an intermediate agency existing for the purpose of aiding consumers in the exercise of their constitutional rights, as well as a private enterprise prosecuted for the benefit of its owners."    *Wheeler v. N. C. Irrigation Co.*, 10 Colo. 582 ; *Farmers' H. L. C. & R. Co. v. Southworth*, 13 Colo. 111 ; *Strickler v. City of Colo. Springs*, 16 Colo. 61 ; *Combs v. Agricultural Ditch Co.*, 17 Colo. 146.

The appellants allege that, by the terms of their contracts, when the company shall have outstanding water right contracts sufficient to cover the amount of water that the company's canal is able to furnish, the right of the company to enter into further contracts is at an end ; and that such limit has been reached.

The company insists that it has the right to dispose of water rights up to the estimated capacity of its canal to carry water.    The rights of the respective parties are therefore to be measured and determined by the construction of the contracts in question ; and the controversy, as above stated, involves only their contractual rights.

The *status* of the defendant company could in no aspect affect these rights.    Its duty to these plaintiffs would be the same whether that duty was to furnish water under their contracts as proprietor or carrier of water.

It is advanced in argument by counsel for appellees, and asserted in the opinion of the court of appeals, that the complaint is obnoxious to demurrer because wanting in certain

*data* essential to a fair construction of the questions involved, in this, that it contains no statement of the size, grade, etc.; in other words, fails to state the cubical dimensions of defendant's ditch, and also fails to state the adjudicated priority of such ditch.

It does not appear to us that these matters are essential to the determination of this controversy, but that the facts alleged fairly present the rights of the respective parties for adjudication.

It is alleged that by reason of prior appropriations the water of the Cache la Poudre river, from which the ditch takes its supply, can furnish water to this ditch in an amount only equal to the three hundred and sixty-six and one half water rights now outstanding and in force for the past two years; and that the water allotted to those rights has been required to irrigate the lands they cover; that there is not sufficient water not otherwise appropriated from the river to enable defendant company to furnish any more water rights, and that the company has disposed of, and there is now outstanding, water rights equal to and in excess of its ability to furnish water.

If, therefore, such conditions limit the right of defendant company to dispose of further rights, as claimed by appellants, and the company carries out its admitted purpose and disposes of additional water rights, it would violate its contract obligations, and it is immaterial what the number of its priority may be, or the size or dimensions of its ditch.

The appellees admit the inability of the irrigation company to furnish water in excess of the water rights outstanding during the irrigation season, but insist, notwithstanding that fact, that it has the right to dispose of water rights up to the estimated carrying capacity of its ditch. This issue is fairly presented by the allegations in the complaint.

The vital and controlling question, therefore, and the only one the decision of which is properly invoked by the issues presented, is—what is the true intent and meaning of the contracts entered into between the irrigation company and

these plaintiffs? In order to determine this the terms used must be read in the light of the circumstances surrounding the parties at the time of their execution, the subject-matter thereof, and the purposes and objects to be accomplished thereby.

The company is the owner of the canal whereby it proposes to divert water from the Cache la Poudre river for the use of the farmers owning land capable of being irrigated therefrom.

The quantity of water necessary to irrigate a given quantity of land was well understood by the contracting parties. Each water right to be disposed of is defined by the company in its printed forms as "A water right to the use of water flowing through the canal of said company, each water right representing one and forty-four hundredths cubic feet of water flowing through a weir per second."

This quantity of water is necessary to irrigate eighty acres of land. Each consumer, having in view the cultivation of his land, and knowing the quantity of water necessary therefor, contracts for water to that end, and purchases a definite number of such water rights. That this definite quantity may be insured to him, except such diminution as may arise from temporary causes, certain conditions are inserted in the contracts, among which are the sixth, seventh and eighth conditions set out in the complaint.

The sixth condition provides a limit to the number of such water rights the company may dispose of. It in no way changes or circumscribes the water right as defined in the granting clause. The language used therein pertinent to this inquiry is:

"The company agrees that when it shall have sold, and have outstanding and in force a number of water rights equal to the estimated capacity of the company's canal to furnish water" it will issue stock, etc.

The controversy arises upon the meaning to be given to the words "estimated capacity to furnish water." Appellees contend that they mean the carrying capacity of the canal.

Appellants insist that they plainly import its furnishing capacity—its ability to supply and deliver water. It appears that some element of uncertainty existed that experience was necessary to decide. It certainly did not arise from the want of *data* to determine the physical capacity of the canal. Its cubical capacity was susceptible of definite measurement; its grade was easy of ascertainment, and by mathematical computation its carrying capacity could be determined, and no estimate of that fact was necessary.

But, since it appears from the allegations of the complaint that other ditches with earlier appropriations derived their supply from the Cache la Poudre river, it was a matter of uncertainty how much water could be obtained by the company's canal after their supply had been taken; and the furnishing capacity of its canal could be ascertained only by experiment, or estimated, that is, approximated, by taking into consideration all the factors upon which its ability to furnish water depended, which necessarily involved taking into consideration the very material fact, to wit, the probable amount of water it could obtain.

The seventh condition affords but little aid to this investigation. It is inserted for the purpose of relieving the company from any liability on account of the inability of its canal to carry and distribute a volume of water equal to its " estimated capacity," in case of unavoidable accident and when, by reason of drouth, such volume becomes insufficient.

This would indicate that the company recognized an obligation to deliver a definite amount of water under normal conditions, and that the capacity of the canal was dependent upon the water supply.

If, as contended, the rights sold were not definite rights, and only represented fractional parts of whatever water might flow in the canal, no liability could accrue under these or any other conditions, and this provision was useless.

The eighth, or prorating, condition seems to be in harmony with the construction we have given to the sixth, and recognizes the estimated capacity of the canal as limited by the

supply of water to be had under permanent and normal conditions, and recognizes the water rights outstanding as rights definite in amount and in the aggregrate equal to such supply. Its language is, " It is further agreed that if by reason of any causes the supply of water shall be insufficient to fill and flow through said canal, according to its estimated capacity, or if from any other cause, as aforesaid, beyond the control of said company, *the supply* shall be insufficient *to furnish* an amount equal to all the water rights then outstanding, the said company shall have the right to distribute such water as may flow through its canal to the holders *of such* water rights *pro rata*," etc.

If the carrying capacity of the canal was to be the criterion instead of its furnishing capacity, why use the words " estimated capacity " in this provision? It would have been enough to say, " If insufficient to fill and flow through said canal ; " but the words " estimated capacity " being used, and the failure of supply arising from temporary causes such as unforeseen accident, drouth, etc., affording the reason for *prorating*, the supply under normal conditions is the recognized factor that limits the number of water rights to be sold and measures the estimated capacity of the ditch to furnish water.

It is not to be presumed that the consumers of water under the company's canal, having in view the acquirement of the use of water for a particular purpose, and one that required for its successful accomplishment a given quantity of water, understood that they were to receive an indefinite fractional part of the water that might flow through the irrigation company's canal, instead of the definite quantity specified in the granting clause of their contracts, unless such understanding is plainly inferable from the language used by the contracting parties, and should not be inferred from doubtful or ambiguous terms.

If the company intended to dispose of a definite number of water rights, regardless of the amount of water it could supply, fair dealing would require it to so specify and define

the rights sold as a fractional part of the water flowing in its canal.

In the light of the purpose, therefore, to be accomplished, we think the words " estimated capacity," limited and modified as they are by the words " to furnish," must be construed as meaning the ability of the canal to supply or deliver water.

With this construction, the contracts in question are fair, legal and equitable. If appellees' contention is correct, and the irrigation company by the terms of these contracts have the right to dispose of definite water rights, and by ambiguous expressions in subsequent provisions reserve the power to render them uncertain and indefinite in quantity, by disposing of water rights admittedly in excess of its ability to furnish water, they are not only inequitable and unfair, but clearly illegal under the decision of this court in *F. H. L. C. & R. Co. v. Southworth*, 13 Colo. 129, wherein it is said :

" A contract to carry more water than has been lawfully diverted would be unlawful ; and to prevent injuries resulting therefrom, or to recover damages in case the injuries are suffered, ample legal remedies exist."

If the terms of a contract admit of two meanings, one of which would render the contract unlawful and the other lawful, the latter construction must be adopted. Bishop on Contracts, sec. 392.

If it be conceded that the term " estimated capacity " is, as used in these contracts, of doubtful meaning, the appellants' contention is sustained by well settled rules of construction. The printed blanks upon which the contracts are written were prepared and the words therein were selected by the company ; and, if of doubtful import, must be taken most strongly against it.

" Doubtful words and provisions are to be taken most strongly against the grantor, he being supposed to select the words which are used in the instrument." *Adams v. Frothingham*, 3 Mass. 361.

In *Noonan v. Bradley*, 9 Wallace, 395, it is said :

" Where doubt exists as to the construction of an instru-

ment prepared by one party, upon the faith of which the other party has incurred obligations or parted with his property, that construction should be adopted which will be favorable to the latter party ; and where an instrument is susceptible of two constructions—the one working injustice and the other consistent with the right of the case—that one should be favored which upholds the right."

The acts of the company in relation to these contracts are persuasive, if not of controlling weight, in their interpretation. It is alleged in the complaint, " That defendant, The Larimer and Weld Irrigation Company * * * by reason of the premises, heretofore for two years and more last past has refused to execute any additional water right contracts, though often requested so to do by divers persons, and except for the wrongful conspiracy hereinafter set forth, has persistently and consistently, through its authorized agents, admitted that it could not dispose of any more water rights without violating its duty to present water right owners and users."

As announced in *McPhee v. Young*, 13 Colo., p. 80 :

" In the construction of a written contract the intentions of the parties are to be first sought in the instrument itself. If the intent and meaning of the parties is not clearly disclosed by the language therein employed, then competent evidence bearing on the construction of the instrument by the parties themselves, as by their acts and conduct in its performance, may be considered for the purpose of ascertaining their understanding of its terms."

In the case of *Chicago v. Sheldon*, 9 Wallace, p. 54, it is said :

In cases where the language used by the parties to the contract is indefinite or ambiguous, and, hence, of doubtful construction, the practical interpretation by the parties themselves is entitled to great, if not controlling, influence."

In whatever aspect these contracts are considered, whether upon the plain import of the language used or by regarding certain terms as of doubtful meaning, their interpretation must be favorable to the contention of the appellants.

It sufficiently appearing by the allegations of the complaint that appellants have certain well defined rights that will be materially impaired if defendants do the acts threatened, we think it states a cause of action clearly cognizable by a court of equity.

The demurrer to the complaint should have been overruled. The judgment of the court of appeals is reversed, with directions to reverse the judgment of the district court of Weld county, and remand the cause to that court for further proceedings in accordance with this opinion.

*Reversed.*

## ON PETITION FOR REHEARING.

PER CURIAM.  In support of the petition for a rehearing, counsel for appellees insist that " the subject-matter of the action is not an easement or a freehold of any kind or nature," and that to " constitute an easement in freehold it must be inseparably annexed to, or appurtenant to, the estate of complainant."   That a valid appropriation of water from a natural stream constitutes an easement in that stream, and that such easement is an incorporeal hereditament, the appropriation being in perpetuity, cannot well be disputed.   Washburn in his work on Easements and Servitudes, in discussing the question of property in water, at page 276, says :

" As forming the subject of property, in connection with the realty, water may be viewed in two lights,—one as constituting one of the elements of which an estate is composed, and giving, by its qualities and susceptibilities of use, a value to such estate ; the other, as being valuable alone for its use, to be enjoyed in connection with the occupation of the soil. In the latter sense, it constitutes an incorporeal hereditament, to which the term *easement* is applied."

Angell on Water Courses, sec. 141, uses this illustration :

" If a miller, or manufacturer, purchases the land itself, over which the water runs, it is evident he would then have a corporeal tenement, and the right which he would possess, in respect to his water course, would be real ; but if he

should purchase a water privilege, or a portion of water power, without any part of the bed of the river, he, in that case, would gain an incorporeal hereditament, or *easement*."

The right acquired to water by an appropriator under our system, is of the same character as that defined by the foregoing authorities as an incorporeal hereditament and easement. The consumer under a ditch possesses a like property. He is an appropriator from the natural stream, through the intermediate agency of the ditch, and has a right to have the quantity of water so appropriated flow in the natural stream and through the ditch for his use.

The argument of counsel for appellee seems to us more a criticism upon the use of the word *easement* in this connection, than an answer to the ultimate conclusion we announced as to the nature and extent of complainant's estate or property. They say: " It is not sufficient for the purposes of this action that the complainant be a part owner in the ditch, which of course is real estate, or even to own a right therein of an incorporeal nature ; but to constitute such right an easement it must be such an interest as will pass by a conveyance of his farm, as an appurtenant thereto, without further description thereof."

And yet it may be said that a water right does come strictly within the definition given by counsel of an easement, except that its source of supply and place of use may be changed. The natural water course, or the ditch, occupies the relation of the servient estate, and the very existence of a water right requires a use which constitutes the dominant estate.

We cannot agree with the proposition that because a water right is susceptible of being changed from one tract of land to another, or its source of supply changed from one point of a natural stream to another, it is any less an easement in the stream, than if it always retained its original point of diversion and place of application. A change of the place of diversion or the place of use does not affect this right either in character or extent.

But the correctness of the conclusions we arrived at de-

pends not so much upon the technical use of terms as upon the substantial right of complainants, which seems to us to be clearly a right incorporeal in its nature, that by its duration constitutes a freehold, and that this action relates to such freehold.

Upon a careful consideration of the other points so forcibly and ably presented by counsel for appellees, we are still of the opinion that our views thereon, as expressed in our former opinion, are correct, and the petition for rehearing is denied.

*Denied.*